GAIDRY, J.
|2The tenants of an apartment appeal the trial court’s summary judgment dismissing their claims for damages against the apartment complex owner. For the following reasons, we affirm the trial court’s judgment.
FACTUAL AND PROCEDURAL BACKGROUND
On February 11, 2005, the plaintiff, Ashley Stuckey, executed an apartment lease for Apartment No. 2907 of the Jefferson Lakes Apartments, an apartment complex owned by the defendant, The Lakes Limited Partnership (The Lakes), and managed by the defendant, Riverstone Residential SC, LP (Riverstone). The term of the lease was from the date of signing to August 30, 2005, and on a month-to-month basis thereafter. Apartment No. 2907 was a two-floor or townhouse apartment, with two bedrooms and two bathrooms on the second floor. In addition to Ashley Stuck-ey, her minor son, Austin Stuckey, and her mother Crystal Stuckey, resided in the apartment.
Maintenance records showed that prior tenants of the apartment had reported a number of intermittent water leaks, in various locations of the apartment, from February 1998 through December 2004. In April 2005, Ashley Stuckey complained to the apartments’ property manager on two *972 occasions of a leak in one of the upstairs bathrooms. After repairs were attempted, Ms. Stuckey delivered a handwritten letter to the property manager, in which she complained about the continuing leak and the accumulation of a “black substance” on the air conditioning vents. She expressed her concern that there might be “a possible mold problem,” and claimed that “we have all been sick with symptoms that are associated with |smold exposure.” The property manager promptly contacted Ashley Stuckey upon receiving the letter to discuss the situation.
On May 9, 2005, Riverstone arranged to have its professional cleaning contractor inspect the apartment for mold. None was reported. The following day, an industrial hygiene technician employed by Air Environmental Services tested the apartment, and found no toxic levels of mold.
On June 14, 2005, the plaintiffs arranged for their own testing of the apartment. On June 27, 2005, the plaintiffs vacated the apartment, apparently after receiving notice of institution of eviction proceedings for nonpayment of rent.
On February 13, 2006, the plaintiffs filed a petition for damages, naming The Lakes and Riverstone as defendants. They alleged that while residing in the apartment from February 12 through June 24, 2005, they and Austin were exposed to toxigenic molds due to the defendants’ negligence and fault. They also alleged that on April 6, 2005, Crystal Stuckey reported a hole in a bathroom wall that was leaking water into the living room downstairs, that fungus was growing in that hole, and that another hole was present in the ceiling of Austin’s bedroom. It was alleged that water damage and visible mold on the ceiling were also reported to the property manager. Because the reported problems were allegedly not remedied, the plaintiffs again notified the property manager by telephone on April 20, 2005 of the hole in the bathroom wall, after which some repairs to the living room ceiling were made. However, according to the petition, the bathroom leak was not addressed. The plaintiffs claimed that the water leaks resulted in the growth of the toxigenic molds, which caused them and Austin to suffer ^various health problems due to that exposure, including bronchial infections, persistent nose bleeds, headaches, nausea, and other conditions.
The defendants answered the petition, denying their liability, but admitting that a leak in an upstairs bathroom was reported around April 15, 2005. The defendants also raised various affirmative defenses, including the plaintiffs’ contributory negligence and fault, the provisions of the lease agreement, and the plaintiffs’ failure to mitigate their damages. They further asserted a reconventional demand against Ashley Stuckey for unpaid rent, attorney fees and costs, and any property damage attributable to her failure to promptly notify the defendants of any water damage or mold contamination.
In her answer to the reconventional demand, Ashley Stuckey generally denied its allegations, except to admit the allegation that she vacated the apartment around June 27, 2005. She further alleged that the “mold problems” were reported to Riv-erstone within a month of her moving into the apartment, and that she made oral and written requests to have those problems addressed.
On October 8, 2007, the defendants filed a motion for summary judgment on the grounds that the terms of the lease served to absolve them of any liability for damages related to mold or mildew. The motion was originally fixed for hearing on December 3, 2007, but the hearing was continued on the plaintiffs’ motion.
*973 The defendants’ motion for summary judgment was eventually heard on March 17, 2008. Following the formal introduction of evidence and oral argument, the trial court ruled in favor of the defendants, finding that the defendants were not liable by virtue of La. R.S. 9:3221. On April 10, 2008, |sthe trial court signed the summary judgment, dismissing the plaintiffs’ claims with prejudice. The plaintiffs now appeal that judgment.
ASSIGNMENTS OF ERROR
We summarize the plaintiffs’ assignments of error as follows:
1. The trial court erred in granting the defendants’ motion for summary judgment, as there are genuine issues of material fact as to the defendants’ actual or constructive knowledge of the defects.
2. The trial court committed legal error in granting the defendants’ motion, as the defendants did not prove entitlement to judgment as a matter of law, based upon the following:
(a) The purported waiver of warranty in the lease agreement is invalid and unenforceable under La. C.C. arts.2004 and 2699, as it was not clear and unambiguous, not clearly brought to Ashley Stuckey’s attention, and purports to immunize the defendants from delictual liability in advance of the occurrence of the tort;
(b) The plaintiffs proved a prima fa-cie case of liability; and
(c) The defendants failed to remedy the defect, the toxigenic mold, after acquiring actual knowledge of its presence.
STANDARD OF REVIEW
This matter comes to us on appeal from a summary judgment. It is therefore subject to de novo review as to whether summary judgment was appropriate. Motorola, Inc. v. Associated Indem. Corp., 02-0716, p. 5 (La.App. 1st Cir.6/25/04), 878 So.2d 824, 828, writs denied, 04-2314, 04-2323, 04-2326, 04-2327 (La.11/19/04), 888 So.2d 207, 211, 212. In undertaking our de novo review, we employ the same standards applicable to the trial court’s determination of the issues. Peak Performance Physical Therapy & |6Fitness, LLC v. Hibernia Corp., 07-2206, p. 5 (La.App. 1st Cir.6/6/08), 992 So.2d 527, 530, writ denied, 08-1478 (La.10/3/08), 992 So.2d 1018.
The summary judgment procedure is expressly favored in the law, and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966(A)(2). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Louisiana Code of Civil Procedure article 967(A) provides that “[s]up-porting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.”
The mover has the burden of proof that he is entitled to summary judgment. See La. C.C.P. art. 966(C)(2). If the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent’s claim, action, or defense. La. C.C.P. art. 966(C)(2). If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the nonmoving party must produce factual support sufficient to satisfy his evidentiary burden at trial. La. *974 C.C.P. art. 966(C)(2). If the mover has put forth supporting proof through affidavits or otherwise, the adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B).
IvDISCUSSION

Legal Principles

Louisiana Civil Code article 2696 establishes the lessor’s warranty against vices or defects in the leased thing:
The lessor warrants the lessee that the thing is suitable for the purpose for which it was leased and that it is free from vices or defects that prevent its use for that purpose.
This warranty also extends to vices or defects that arise after the delivery of the thing and are not attributable to the fault of the lessee.
Louisiana Civil Code article 2697 further provides that:
The warranty provided in the preceding Article also encompasses vices or defects that are not known to the lessor.
However, if the lessee knows of such vices or defects and fails to notify the lessor, the lessee’s recovery for breach of warranty may be reduced accordingly.
Louisiana Civil Code article 2699 provides for the lessee’s waiver of the warranty against vices or defects in certain circumstances:
The warranty provided in the preceding Articles may be waived, but only by clear and unambiguous language that is brought to the attention of the lessee.
Nevertheless, a waiver of warranty is ineffective:
(1)To the extent it pertains to vices or defects of which the lessee did not know and the lessor knew or should have known;
(2) To the extent it is contrary to the provisions of Article 2004;
(3) In a residential or consumer lease, to the extent it purports to waive the warranty for vices or defects that seriously affect health or safety.
Louisiana Revised Statutes 9:3221 provides:
Notwithstanding the provisions of Louisiana Civil Code Article 2699, the owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon | /rom the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time. (Emphasis added.)
The emphasized introductory phrase of the last-cited statute was added effective January 1, 2005, as part of the same act that amended and reenacted La. C.C. art. 2699. Although La. C.C. art. 2699 and La. R.S. 9:3221 are in pan materia, article 2699 deals with the contractual obligations between the parties to the lease, rather than with delictual obligations that may arise related to the leased property. See La. C.C. art. 2699, Revision Comments — 2004, (h). Thus, La. C.C. art. 2699 does not supersede the provisions of La. R.S. 9:3221 that govern and allocate such delictual obligations between the parties. Id. Louisiana Revised Statutes 9:3221 is a statutory exception to the strict liability of La. C.C. art. 2696, and is expressly recognized as not subject to the provisions of La. C.C. art. 2699.
Louisiana Civil Code article 2004 provides that “[a]ny clause [in a contract] is *975 null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party.” However, its provisions do not supersede La. R.S. 9:3221. La. C.C. art.2004, Revision Comments — 1984, (f).
We therefore conclude that the trial court did not commit legal error in finding La. R.S. 9:3221 legally applicable to the facts of this case.

The Terms of the Lease Agreement

The initial term of the lease agreement was for a period of slightly over six months, ending August 30, 2005, with monthly rent of $685.00. Paragraph 11, although primarily directed to the subject of insurance, also contains language relevant to the issues presented:
11. Insurance. Owner recommends that Resident secure Renter’s insurance to help protect Resident and Resident’s property. Owner is not responsible for, and will not provide | afire or casualty insurance for, the personal property of Resident or occupants of the Unit.... Neither Owner nor Owner’s managing agent shall be liable to Resident, other occupants of the Unit or their respective guests for any damage, injury or loss to person or property (furniture, jewelry, clothing, etc.) from ... flood, water leaks, rain, ... or other occurrences unless such damage, injury, or loss is caused exclusively by the negligence of Owner .... (Emphasis added.)
Paragraph 17 of the lease agreement is captioned “Delivery of Unit,” and concludes with the following provision:
TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, OWNER EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED RELATING TO THE UNIT OR ANY FURNITURE, FURNISHINGS, EQUIPMENT OR APPLIANCES, IF ANY, IN THE UNIT INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, HABITABILITY OR SUITABILITY.
Finally, and most importantly for our purposes, Paragraph 26(a) specifically provides the following:
Mold & Mildew Resident(s) acknowledges that the apartment is located in a State which has a climate conducive to the growth of mold and mildew. It is, therefore, necessary to provide proper ventilation and dehumidification to the apartment to minimize the growth of mold and mildew. The only effective method to properly condition the air is to operate the heating and/or air conditioning ventilation system at all times throughout the year, even during those times when outside temperatures are moderate. Please understand that Management is not responsible for any injury, illness, harm or damage to the apartment or any person or property caused by or arising from, in whole or in part, mold or mildew. (Emphasis added.)
It is certainly open to question whether the first and second paragraphs quoted above sufficiently express the intent that Ashley Stuckey assumed general responsibility for the condition of the apartment for purposes of La. R.S. 9:3221. We note that the first paragraph’s stated title, “Insurance,” and its context might suggest that it relates only to responsibility for securing insurance. At any rate, we conclude that hnParagraph 26(a) clearly and adequately expresses the parties’ intent that, as between them, the responsibility for any condition or defect involving mold or mildew in the apartment would rest upon Ashley Stuckey, for purposes of *976 application of La. R.S. 9:3221. The paragraph describes necessary preventative measures, the operation of the apartment’s individual heating and air conditioning system, obviously within the primary control and responsibility of the resident tenant, and specifically and unambiguously provides that the lessor will have no responsibility for mold or mildew in the apartment.
As previously noted, La. R.S. 9:3221 operates as an express statutory exception to La. C.C. art. 2699 where the lessee assumes responsibility for the condition of leased premises. Where the language of a provision transferring delictual liability under La. R.S. 9:3221 is clear and unambiguous, the law does not require that the provision be brought to the lessee’s attention or explained to him. Greely v. OAG Properties, LLC, 44,240, p. 4 (La.App. 2nd Cir.5/13/09), 12 So.3d 490, 494. See also Ford v. Bienvenu, 00-2376, pp. 6-9 (La.App. 4th Cir.8/29/01), 804 So.2d 64, 68-70, writ denied, 01-2688 (La.12/14/01), 804 So.2d 639. Thus, La. C.C. art. 2699’s requirement that a waiver of the lessor’s warranty against vices or defects be brought to the attention of the lessee does not apply to a provision transferring responsibility for purposes of La. R.S. 9:3221.
The deposition testimony of Ashley Stuckey and Connie Stuckey was generally corroborative of the allegations of their petition regarding the reporting of the water leak in the bathroom. In her affidavit and deposition, Ashley Stuckey denied that anyone on behalf of the defendants fixed the leak after it was initially reported, a disputed point between the parties. In her deposition, Ashley Stuckey confirmed that she did not observe any black | n sub stance on any air conditioning vent upon moving in, and described herself as “excited” to be moving into the “very white apartment.”
The deposition of Connie Campbell, Riv-erstone’s property manager for the apartment complex, was filed in the record. She testified that she had been employed in that capacity since March 2000, and that during that time there had been no complaints of mold in Apartment No. 2907, other than that of Ashley Stuckey on May 6, 2005. When she and Riverstone’s maintenance supervisor inspected the apartment on May 6, 2005, she observed a circular water stain, about two feet in diameter, on the living room ceiling. A representative of Guaranty Systems, a specialty cleaning contractor, also inspected the air conditioning vents on May 9, 2005, and verbally reported to Ms. Campbell that no evidence of mold was found. A technician of Air Environmental Services, an environmental testing service, reported that his inspection of May 10, 2005 found no toxic mold, and that mold levels with the apartment were no higher than those outside the apartment. Ms. Campbell did acknowledge in her deposition that no professional remediation for mold was performed at the apartment between April 6, 2005, and June 27, 2005, when the plaintiffs vacated it.
The deposition of Ralph Oby, Rivei'-stone’s maintenance supervisor, was also filed in the record. Although he acknowledged that he inspected Apartment No. 2907 following the May 2005 complaint of suspected mold, he testified that he observed only what appeared to be water stains, and that he never suspected mold in the apartment. Because he never suspected the actual presence of mold, he did not institute any remediation steps. He further confirmed that the Guaranty Systems representative who inspected the apartment verbally reported that no mold was present in the apartment, and agreed that there were only water stains. However, the representative | ^recommended *977 that an environmental testing company be consulted. Mr. Oby conceded that generally, if a water problem in an apartment is not corrected within 48 hours, there is a “significant potential” for the growth of mold. Another maintenance worker, Mr. Aubin, was deposed. He described repair work to fix the leaks, but denied ever observing any condition suggestive of the presence of mold in the apartment. He also acknowledged various discussions with Mr. Oby at different times concerning conditions that might lead to development of mold, but he denied knowing of any actual mold problems or issues in the apartment complex.
The plaintiffs filed the affidavit of Brandon Phillips, the employee of Envirotest, Inc., in charge of testing performed at the request of the plaintiffs’ attorney. Mr. Phillips’s affidavit was dated March 6, 2008 and filed with the trial court on March 10, 2008. According to Mr. Phillips’s affidavit, the on-site testing was performed on June 14, 2005. The report referenced in his affidavit shows that the third-party testing laboratory received the samples on June 15, 2005, and issued its certificate of analysis and analysis summary on June 23, 2005. In his affidavit, Mr. Phillips attested to the following:
8. I am of the opinion that a responsible landlord, who is responsible for the maintenance of the Jefferson Place Apartments, should have known of the existence of this mold in sufficient time to properly remediate this mold....
9. ... Ordinarily, a lay person is incapable of determining the difference between mold and dust, as microscopic analysis may be necessary to determine the contents of the dust.
10. I am of the opinion that a responsible, prudent landlord ... should have known what the preconditions for mold were and should have been aware of the significant risk of the development of mold in this apartment unit, due to the fact that there had been multiple complaints of water leaks ... between 1998 and 2005.
11sSignificantly, although he made reference to the reported prior water leaks in his affidavit, Mr. Phillips did not attribute the presence of mold to those leaks; instead, he described “the underlying problem in this apartment which caused the growth of the mold” as “humidity.” Even more significantly, neither the affidavit nor the analysis report show that any of the direct transfer samples (taken from surfaces) were obtained from the actual locations of reported water leaks. Mr. Phillips expressed the opinion that “[although mold may develop in a 48 hour period, based upon [his] experience, the extent of the mold growth found inside of the heating and air conditioning vents ... would not have developed to the extent [he] observed ... on 6/14/05.” (Emphasis added.) He also stated: “[I]t is my opinion evidence [sic] that there has been a humidity problem within the apartment which has been in existence since 1998.” (Emphasis added.) He did not describe the factual bases of that opinion, such as the basis for 1998 being the year the “humidity problem” began. There is nothing in the affidavit evidencing or suggesting that the results of the testing or any of Mr. Phillips’s described conclusions were communicated to the defendants prior to June 23, 2005 at the earliest.
Finally, as pointed out by the defendants, there was no factual foundation set forth in the affidavit that Mr. Phillips was competent to express conclusory opinions relating to the standard of care of a “responsible landlord,” responsible for apartment maintenance. Whether the defendants had the obligation to maintain the apartment and to repair reported prob *978 lems is not determinative of their duties for purposes of tort liability under the standards imposed by La. R.S. 9:3221. There is a distinction between liability for damages occasioned by defects in leased premises and who has |14the obligation to repair such defects. Hebert v. Neyrey, 445 So.2d 1165,1168 n. 3 (La.1984).
The plaintiffs contend on appeal that Ms. Campbell, as property manager of the complex, should have performed a “reasonable inspection” of Apartment No. 2907 prior to leasing it to Ashley Stuckey. In the first place, the record does not affirmatively show that the defendants failed to inspect the apartment prior to the plaintiffs’ occupancy. As the parties alleging that circumstance as a basis for the defendants’ negligence, the plaintiffs would bear that burden at trial. Secondly, the record confirms that Ashley Stuckey herself inspected the apartment, signed the required apartment move-in inspection form acknowledging that all items were in good condition, and reported no problems with it prior to occupancy. Most importantly, however, the jurisprudence interpreting La. R.S. 9:3221 does not support the imposition of a duty on the part of a lessor to inspect conditions over which a lessee has assumed responsibility.
In Chau v. Takee Outee of Bourbon, Inc., 97-1166 (La.App. 4th Cir.2/11/98), 707 So.2d 495, the plaintiff, an employee of a building’s lessee, was injured when a portion of the ceiling collapsed upon her. She sued the two co-owners and lessor of the building. One co-owner filed a motion for summary judgment based upon a lease clause shifting responsibility for defects to the lessee. It was undisputed that the co-owner had no actual knowledge of the defective ceiling and had received no actual notice of it prior to the accident. The court framed the pivotal issue as follows:
The real issue is whether [the co-owner] should, have made any inspections, or engaged someone to make inspections, as to the safety of the building. In terms of statutory interpretation, does the phrase “should have known” in the statute imply that the owner must take active steps, such as inspections, to determine whether there are defects in the property?
| mId. at p. 4, 707 So.2d at 497. The court reasoned that in order to determine the meaning of the phrase “should have known” as used in the statute, it was necessary to consider the recognized purpose of La. R.S. 9:3221. That purpose was to relieve the owner lessor of strict liability under former La. C.C. arts. 2317, 2322, and 2695 (the latter now embodied in La. C.C. art. 2696), and to limit any liability to the negligence standard expressed in the statute. The court further observed that La. R.S. 9:3221 “was undoubtedly designed to relieve the owner of some of the burdens imposed upon him by law in cases where he had given dominion or control of his premises to a tenant under a lease.” Id. at p. 6, 707 So.2d at 498, quoting Gilliam v. Lumbermens Mut. Cas. Co., 240 La. 697, 124 So.2d 913 (La.1960). The court concluded that “the phrase ‘should have known’ in the statute should not be construed to impose expansive burdens upon the owner lessor,” and that “imposing such a duty to inspect would all but completely deny [the co-owner] the relief granted to her by La. R.S. 9:3221” and would “frustrate the legislative purpose.” Id.
The plaintiff in Jamison v. D’Amico, 06-0842, p. 1 (La.App. 4th Cir.3/14/07), 955 So.2d 161, 163, writ denied, 07-0764 (La.6/1/07), 957 So.2d 179, was injured when the floor of a building collapsed beneath her. She alleged that the owner-lessor was negligent in failing to inspect the premises and failing to make necessary *979 repairs. The court in Jamison concluded that while the plaintiff introduced evidence that the owner-lessor had knowledge of roof leaks, the evidence failed to establish that he knew or should have known of the defective condition of the flooring, the particular defect at issue in that case. Citing its earlier holding in Chau, the court concluded that because the lessee contained a clause shifting responsibility under La. R.S. 9:3221, the owner-lessor was under no duty to inspect the premises, and | Hithere was “no basis to conclude that he should have known of the defect in the flooring of the premises.” Id. The court concluded that the plaintiff failed to produce factual support sufficient to establish that she could meet her burden of proof at trial, and that summary judgment was therefore appropriate.
The plaintiffs’ opposition affidavits do not show that the defendants knew or should have known of any unusual “humidity problem” with Apartment No. 2907, nor any unusual potential for mold or mildew beyond that typical to Louisiana’s climate. At best, the plaintiffs put forth evidence suggestive of the possibility that the defendants should have known of the potential for the development of mold or mildew. But such evidence simply does not rise to evidence creating a genuine issue of material fact on the issue of whether the defendants should have known or received adequate notice of the presence or even probability of development of mold or mildew, the defect of which the plaintiffs complain.
We agree with the trial court’s conclusions that the defendants did not know and did not have reason to know of the alleged mold until their receipt of Ashley Stuckey’s letter of May 6, 2005, and that upon receiving such notice, the defendants sought to investigate and remedy the claimed condition within a reasonable time. See, e.g., Meyers v. Drewes, 196 So.2d 607, 611 (La.App. 4th Cir.1967). The plaintiffs do not dispute that the defendants even offered them the use of another apartment while the report of suspected mold was being investigated. The failure of the plaintiffs to meet their burden of proof on this element is fatal to them opposition to summary judgment.
i17decree
The judgment of the trial court is affirmed. All costs of this appeal are assessed to the plaintiffs-appellants, Ashley Stuckey and Crystal Stuckey.
AFFIRMED.
GUIDRY, J., dissents.